**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

ZP NO. 314, LLC,                    *
                                    *
    **Plaintiff**,                *
                                    *
vs.                                 *       **CIVIL ACTION NO. 16-00521-B**
                                    *
ILM CAPITAL, LLC, *et. al.*,        *
                                    *
    **Defendants**.              *

<u>**ORDER**</u>

This action is before the Court on Plaintiff ZP No. 314, LLC's motion for summary judgment and evidentiary materials (Doc. 106), Defendants' response and evidentiary materials in opposition thereto (Docs. 115, 116, 117), and Plaintiff's reply (Doc. 121, 122). Also pending before the Court are Defendants' motions for summary judgment and evidentiary materials (Doc. 82, 84, 85, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103), Plaintiff's response and evidentiary materials in opposition thereto (Doc. 87, 88, 121), and Defendants' reply (Doc. 89, 90, 91, 123, 124, 125). These motions have been fully briefed and are ripe for resolution.

**I.   INTRODUCTION**

This trademark action involves One Ten Student Living and Campus Quarters, which are competing off-campus student housing facilities located in close vicinity to each other and owned and operated by Plaintiff ZP No. 314, LLC (hereinafter "Plaintiff" or "ZP") and the Defendants, respectively. ZP is a limited liability

company and owner of One Ten Student Living ("One Ten"), which provides student housing and related services to local college students. (Doc. 60 at 4; Doc. 106 at 1). The One Ten facility is located at 110 Long Street, in Mobile, Alabama, and its website is www.liveoneten.com. (Doc. 60 at 4; Doc. 106-4 at 43-44).

Defendant ILM Capital, LLC ("ILM Capital") is a real estate investment firm that owns the Campus Quarters facility. (Doc. 60 at 2; Doc. 66 at 2; Doc. 115 at 5). The Campus Quarters facility is also located in Mobile, Alabama, and its website is www.campusquarters.com. (Doc. 66 at 4; Doc. 106 at 1; Doc. 115 at 5-6). Defendant Mobile CQ Student Housing, LLC ("Mobile CQ") owns the real property on which Campus Quarters is located. (Doc. 60 at 2; Doc. 66 at 4; Doc. 115 at 5). Defendant ILM Management, LLC ("ILM Management") manages Mobile CQ. (Id.). Defendant WE Communities, LLC ("WE Communities") is a property management company that has managed Campus Quarters since approximately May 2016. (Doc. 60 at 2; Doc. 66 at 4; Doc. 115 at 5). Defendant Mary Schaffer-Rutherford ("Rutherford") is a former employee of WE Communities who managed Campus Quarters for approximately seven months.[1] Defendant Michael Wheeler ("Wheeler") is the manager, CEO, and sole member of ILM Capital, ILM Management, and WE

---

[1] Defendants contend that Rutherford no longer has any relationship or affiliation with any of her co-defendants or Campus Quarters student apartments. (Doc. 60 at 2; Doc. 66 at 4; Doc. 115 at 6).

Communities. (Doc. 60 at 2; Doc. 66 at 2; Doc. 115 at 5). Defendant A.J. Hawrylak ("Hawrylak") is an employee of ILM Capital. (Id.).

The events giving rise to the instant cause of action center around eight domain names purchased by Defendants.[2] ZP contends that, through the registration and/or use of domain names that are confusingly similar to its marks, Defendants have willfully infringed on its marks, have acted as cybersquatters by intending to profit from the goodwill associated with ZP's marks, and have unfairly competed with ZP. In its amended complaint, ZP has alleged cybersquatting in violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); unfair competition, contributory unfair competition, and vicarious unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); common law unfair competition; and unfair competition and trademark infringement in violation of Alabama Code Section 8-12-16 and state common law. (Doc. 60 at 11-13).

## II. RELEVANT UNDISPUTED FACTS[3]

---

[2] The eight domain names at issue are sometimes referred to collectively as the "domains" or "domain names." Each domain name is listed in its entirety, *infra*.

[3] The facts set forth in this opinion have been gleaned from the parties' statements of facts claimed to be undisputed and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving parties. See Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002); Priester v. City of

Plaintiff ZP avers that it adopted the name "One Ten" for its student housing facility and began using the "One Ten" mark in interstate commerce as early as October 28, 2015. (Docs. 106 at 2; 106-1 at 3). Indeed, ZP used the One Ten mark in connection with the signing of a Management Agreement with Asset Campus Housing ("ACH"), the company that manages One Ten, and it circulated the agreement (which it named the "One Ten Mgmt Agmt FE") via email with a subject line titled "One Ten PMA" on October 29, 2015. (Doc. 106-3 at 4; Doc. 106-4 at 2).

On December 3, 2015, ZP registered the domain name "liveoneten.com" with the registrar GoDaddy.com. (Doc. 106 at 2; Doc. 106-1 at 3; Doc. 106-4 at 68-69). By February 26, 2016, ZP was using the domain name, "liveoneten.com" to market One Ten on ZDC's then-existing website. (Doc. 106 at 2; Doc. 106-1 at 3; Doc. 106-6 at 2-3).

In late 2015, Defendant ILM Capital learned that ZDC would be building a new student housing facility, and in April 2016, learned that the facility would be named "One Ten." (Doc. 95 at 8; Doc. 98-1 at 5; Doc. 115 at 6). On April 12, 2016, Defendant ILM's general counsel accessed ZDC's website to view One Ten's advertisement. (Doc. 106 at 3; Doc. 106-2 at 9-10; Doc. 106-5 at

Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000). ("[T]he 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case.").

32; Doc. 106-6 at 2-3). The following month, Defendants ILM and Hawrylak began registering domain names that incorporated the words "one ten." Specifically, on May 11, 2016, Defendant Hawrylak, acting on behalf of ILM Capital, registered the following domain names through third party domain name registar Go.Daddy.Com, LLC: "onetenlive.com," "liveontenmobile.com," "liveone10.com," "onetenstudentliving.com," and "onetenliving.com", which are collectively referenced as the "May 11 domains." (Doc. 95 at 8; Doc. 98-1 at 5-6; Doc. 106 at 3; Doc. 106-2 at 5-6, 8; Doc. 106-5 at 20-24, 34; Doc. 106-7 at 5-6; Doc. 115 at 7).

On May 26, 2016, the website for One Ten, www.liveoneten.com, went live. (Docs. 60 at 4; 66 at 3; 106 at 4; 106-3 at 3-4). The next day, May 27, 2016, Hawrylak registered three additional domain names, namely: "onetenusa.com," "liveonetenapartments.com," and "liveonetenmobile.com", which are collectively referenced as the "May 27 domains."[4] (Doc. 95 at 9; Doc. 98-1 at 7; 106 at 3; Doc. 106-2 at 5-6, 8; 106-5 at 20-24, 34; Doc. 106-7 at 5-6; Doc. 115 at 7).

In May 2016, ZP created social media pages for One Ten and began making posts on those sites. (Doc. 106 at 3; Doc. 106-3 at 3-4; Doc. 106-4 at 43). On May 28, 2016, and June 3, 2016, within

_____

[4] As discussed, *infra*, Defendants renewed their registration of these domain names on March 14, 2017 (Docs. 60 at 7; 66 at 7; 106 at 10; 106-5 at 30-31), and again on May 11 and 27, 2018. (Doc. 112).

days of its first social media posts and its website going live, ZP was contacted by its first prospective tenants. (Doc. 106 at 4-5; Doc. 106-4 at 63-65).

On June 14, 2016, Defendants began redirecting users of the May 11 domains to their own website, "campusquarters.com", such that, if a user typed in one of the May 11 domains into an internet browser, the user would be redirected to the website for Campus Quarters. (Doc. 95 at 8-11; Doc. 98-1 at 5-7; Doc. 106 at 5; Doc. 106-2 at 10-11; Doc. 115 at 7-8).

On August 18, 2016, online leasing became available for One Ten, but student occupancy did not occur until a year later in August 2017. (Doc. 66 at 3, 83 at 7, 54-55; Doc. 89 at 2, 5; Doc. 115 at 6). On September 19, 2016, ZP learned that Defendants were redirecting users of one of the May 11 domains, namely "onetenstudentliving.com," to the Campus Quarters website.[5] (Doc. 106 at 7). On the same day, a representative from ACH, which manages One Ten for ZP, sent an email to Defendant Hawrylak requesting that Defendants end the redirection of the domain name. (Doc. 106 at 7; Doc. 106-5 at 18, 51-52). Hawrylak forwarded the email to an ILM representative asking for guidance on how to

---

[5] ZP contends that it did not learn of the existence of four of the other May 11 domains or any of the May 27 domains until it received subpoena responses from GoDaddy.com in February 2017. (See Doc. 60 at 7).

respond to the request, and the ILM representative advised Hawrylak, "Tell him FU!" (Doc. 106 at 7; Doc. 106-5 at 51).

On September 19, 2016, ZP's in-house counsel sent Defendants cease and desist letters, demanding that Defendants: "(i) transfer any and all rights in and to the onetenstudentliving.com domain name to ZP NO. 314, LLC; (ii) cease and desist from any and all use of the onetenstudentliving.com domain name; and (iii) cease and desist from any and all use of ZP NO. 314, LLC's name and the One Ten name." (Doc. 60 at 7; 66 at 7; Doc. 106 at 7-8; Doc. 106-1 at 3, 31-42; Doc. 106-5 at 25-29; Doc. 106-13 at 2-3). On September 20, 2016, after receiving the cease and desist letter dated September 19, 2016, Defendants ceased the redirection of all May 11 domains. (Doc. 83 at 9; Doc. 87-12 at 34-38; Doc. 95 at 12; 115 at 8).[6]

ZP sent a second cease and desist letter to Defendants on September 23, 2016. (Doc. 60 at 7; Doc. 66 at 7; Doc. 106 at 8; Doc. 106-5 at 3-4; Doc. 106-13 at 3, 6-7). The September 23 letter included a demand that Defendants relinquish and transfer the

_____

[6] Prior to the May 11 domains being redirected on June 14, 2016, and after the redirection ceased on September 20, 2016, Defendants "parked" the May 11 domains, meaning that the sites had no substantive content and no longer redirected the user to the Campus Quarters' website. (Doc. 83 at 9; Doc. 87-12 at 34-38; Doc. 95 at 12; Doc. 115 at 8).

"onetenstudentliving.com" domain name to ZP.  (Id.).  Defendants declined to do so.  (Doc. 112).

ZP filed the instant action on October 6, 2016. (Docs. 1). Subsequent thereto, on December 5, 2016, ZP applied with the United States Patent and Trademark Office ("USPTO") for registration of the trademark "One Ten Student Living".  (Doc. 60 at 4; Doc. 66 at 3).  With no objection from Defendants, the USPTO issued ZP a certificate of registration for the  "One Ten Student Living" mark on July 25, 2017.  (Doc. 60 at 5; Doc. 60-1; Doc. 66 at 3; Doc. 106 at 10; Doc. 106-17).  Additionally, on March 16, 2017, ZP applied to register the trademark "One Ten" with USPTO. The application was approved on June 9, 2017 and publication occurred on October 17, 2017.[7]  (Doc. 60 at 5; Doc. 60-2; Doc. 106 at 10; Doc. 106-17).  The Alabama Secretary of State issued certificates of registration for the marks on March 23, 2017. (Doc. 60 at 5; Doc. 60-3).

**III. PROCEDURAL HISTORY**

As noted, *supra*, this action was instituted on October 6, 2016, when ZP filed its initial complaint against ILM Capital, WE Communities, Rutherford, and Mobile CQ.  (Doc. 1).  On November 3, 2016, Defendants filed a motion to dismiss and/or for a more

---

[7] The marks "One Ten Student Living" and "One Ten" are hereinafter collectively referred to as the "marks".  Each individual mark will continue to be referenced by its name where appropriate.

definite statement. (Docs. 9, 10). On February 21, 2017, ZP timely filed a motion for leave to file an amended complaint. (Doc. 32). In its motion, ZP requested leave to add three additional Defendants – Wheeler, Hawrylak, and ILM Mobile Management – as well as additional claims against all Defendants based on vicarious and contributory liability. On March 30, 2017, the Court granted ZP's unopposed motion for Leave to File an Amended Complaint and denied as moot Defendants' motion to dismiss and/or for a More Definite Statement. (Doc. 39). Accordingly, ZP filed its first amended complaint on March 30, 2017, and Defendants filed their answers on April 13, 2017, April 27, 2017, May 2, 2017, and June 6, 2017. (Docs. 41, 43, 44, 45, 46, 47, 48, 49, 50).

On August 31, 2017, ZP filed a second motion to amend its complaint. (Doc. 55). In its motion, ZP requested leave to correct the name of a domain name that was inadvertently misidentified in its first amended complaint, in addition to adding facts related to its claims, elect statutory damages on its cybersquatting claims, and withdraw its trademark dilution claims. With no opposition from Defendants, ZP's request to file a second amended complaint was granted. The second amended complaint was filed on September 19, 2017, and Defendants' answer was filed on October 3, 2017. (Doc. 60; Doc. 66).

As noted *supra*, this action is now before the Court on the parties' respective motions for summary judgment and supporting

briefs.  The motions have been fully briefed, and are now ripe for resolution.

### IV.  SUMMARY JUDGMENT STANDARD

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (citation omitted) (emphasis in original)).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  When faced with a properly supported motion for summary judgment, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  Id.  A plaintiff may not simply rest on the allegations made in the complaint, but must instead, as the party bearing the burden of proof at trial, come forward with at least some evidence to support each element essential to her case at trial.  Anderson, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment

'may not rest upon the mere allegations or denials of [her] pleading but . . . must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is mandated in the absence of such a showing. Celotex Corp., 477 U.S. at 322; see also Webb v. Ocwen Loan Servicing, LLC, 2012 U.S. Dist. LEXIS 167079, *4-5, 2012 WL 5906729, *1 (S.D. Ala. Nov. 26, 2012) ("[a] moving party is entitled to summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (quoting In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995); and Celotex Corp., 477 U.S. at 323) (internal quotation marks omitted)).

"[A]t the summary judgment stage, the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's Inc., 62 F. Supp. 2d 1366, 171 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V.    DISCUSSION

As noted, *supra*, ZP's second amended complaint alleges unfair competition in violation of 15 U.S.C. § 1125(a) (Count I); contributory unfair competition (Count II); vicarious unfair competition (Count III); cybersquatting in violation of 15 U.S.C. § 1125(d) (Count IV); common law unfair competition (Count V); and unfair competition and trademark infringement under Alabama Code § 8-12-1, *et seq.,* and Alabama common law (Count VI). (Doc. 60 at 9-14). For the reasons set forth below, Plaintiff's motion for summary judgment is **DENIED**; and Defendants' motions for summary judgment are **GRANTED, in part, and DENIED, in part**, as set forth herein.

### A. <u>Cybersquatting (Count IV)</u>.

ZP argues that Defendants have violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d)(1)(A) because they "registered, trafficked in or used a domain name that is identical or confusingly similar to a trademark that is distinctive" and "they had a bad faith intent to profit from the marks". (Doc. 106 at 11-24). According to ZP, its marks are distinctive, and Defendants registered and used domain names that are confusingly similar to ZP's distinctive marks in order to promote their own competing commercial interests and to divert internet users searching for ZP's website to Defendants' website, with the admitted intent to redirect and confuse the public and

profit from the goodwill associated with ZP's distinctive marks. (Id.). Defendants, on the other hand, assert that because it is undisputed that their alleged misconduct occurred in May 2016, and because ZP had not acquired trademark rights in its marks prior to that time, ZP cannot prevail on its cybersquatting claim. Further, according to Defendants, Plaintiff's claims fail as a matter of law because Plaintiff's marks are merely "descriptive," and they had not acquired secondary meaning as a matter of law prior to Defendant's alleged misconduct.

The Court begins its analysis with Count IV, Plaintiff's claim under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d)(1)(A). The ACPA was enacted to prevent cybersquatting, which the Eleventh Circuit has described as "essentially extortion." Jysk Bed'N Linen v. Dutta-Roy, 810 F.3d 767, 775 (11th Cir. 2015). The ACPA provides that:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person –
>
> > (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that –
> >
> > > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is

>           identical or confusingly similar to
>           that mark[.]

>           . . .

15 U.S.C. § 1125(d)(1)(A).  Thus, a defendant violates the ACPA if it registers, traffics, or uses a domain name that is identical or confusingly similar to a distinctive mark with a bad faith intent to profit from its act(s).  Id.; see also Jysk, 810 F.3d at 775. With respect to the element of bad faith intent to profit, the ACPA provides an exception, the safe-harbor provision, which provides that "bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).

As a preliminary matter, the undersigned notes that the parties dispute whether Defendants' re-registration of the subject domain names in March 2017 and May 2018 constitutes an actionable offense under the ACPA.  (Doc. 66 at 7; Doc. 83 at 26-31; Doc. 106 at 10, 24; Doc. 106-5 at 30-31; Doc. 115 at 8).  The Eleventh Circuit firmly resolved this issue when it held that, "[t]he plain meaning of register includes a re-registration[,]" such that re-registration falls under the purview of the ACPA.  Jysk, 810 F.3d at 777 ("It would be nonsensical to exempt the bad-faith re-registration of a domain name simply because the bad-faith behavior

occurred during a noninitial registration, thereby allowing the exact behavior that Congress sought to prevent."); see also Sound Surgical Tech., LLC v. Leonard A. Rubinstein, M.D., P.A., 734 F. Supp. 2d 1262, 1277 (M.D. Fla. 2010) (noting that "a bad faith intent to profit from a domain name can arise either at the time of registration or at any time afterwards."); Heron Dev. Corp. v. Vacation Tours, Inc., 2017 WL 2895921 at *14, 2017 U.S. Dist. LEXIS 57602 at *37-40 (S.D. Fla. Apr. 13, 2017) (noting that "registration (or re-registration) . . . is sufficient to trigger liability under the ACPA."); Xereas v. Heiss, 933 F. Supp. 2d 1, 17 (D.D.C. 2013) ("The terms "register" and "registration" in § 1125(d)(1)(A) should be read to refer to the initial registration and later re-registrations of the domain name."); American Cruise Lines v. HMS Am. Queen Steamboat Co., LLC, 2017 WL 3528606 at *13, 2017 U.S. Dist. LEXIS 130430 at *34 (D. Del. Aug. 16, 2017) ("Consistent with the purpose and text of the Act, re-registration is a qualifying registration for liability."). Accordingly, Defendants' March 2017 and May 2018 re-registrations of the domain names are actionable under the ACPA (see Doc. 112), such that the Court's analysis will include consideration of those events.

## 1. Distinctiveness of Marks *before* July 2017.

In order for ZP to establish its cybersquatting claim against Defendants, it must show, among other things, that its marks were inherently distinctive or that they acquired secondary meaning

and, thus, became distinctive before the alleged trademark violations occurred, since "[t]rademark or service mark protection is only available to 'distinctive' marks . . . that serve the purpose of identifying the source of the goods or services. . . ." Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 (11th Cir. 2007) (internal citations omitted). Trademarks may be inherently distinctive or may become distinctive by "becoming associated in the minds of the public with the products or services offered by the proprietor of the mark. . . ." Id.

There are four "gradations of distinctiveness" of marks: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. Welding Servs., 509 F.3d at 1351; see also Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir. 1980).[8] Defendants argue that ZP's marks, "One Ten" and "One Ten Student Living," are descriptive. (Docs. 83 at 20-21; 115 at 15-17). As described by the Eleventh Circuit:

> A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be "BarnMilk." Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as "Barney's" to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name mark acquires secondary

---

[8] All Fifth Circuit decisions handed down prior to the close of business on September 30, 1981, are binding on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209, (11th Cir. 1981).

> meaning, it is afforded the strength of an inherently
> distinctive mark. Marks which are descriptive of
> geographic location of the source of the service are
> treated in the same manner as personal name marks.

Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519,

1522-23 (11th Cir. 1991) (internal citations omitted); see also

Welding Servs., 509 F.3d at 1357-58; Soweco, 617 F.2d at 1183-84.

Based on the aforementioned, the Court finds that ZP's marks

are descriptive.[9] ZP's One Ten Student Living facility is located

at 110 Long Street, Mobile, Alabama, 36608. (Doc. 83 at 5). Thus,

the marks are "descriptive of the geographic location of the source

of the service[,]" Investacorp, 931 F.2d at 1532, making them

descriptive and not inherently distinctive, which means that they

are only entitled to protection under the ACPA if they acquired

---

[9] To the extent that Defendants assert that the marks are not
entitled to protection under the ACPA simply because they are not
"famous" (see Doc. 115 at 16), the Court rejects this argument.
The text of the ACPA protects marks that are distinctive or famous.
See 15 U.S.C. § 1125 (d)(1)(A)(ii)(I), (II). Where statutory
language is unambiguous, the Court is required to apply the plain
meaning of the words. Cox Enter., Inc. v. Pension Ben. Guar.
Corp., 666 F.3d 697, 704 (11th Cir. 2012); see also Silva-Hernandez
v. U.S. Bureau of Citizenship and Immigration Servs., 701 F.3d
356, 361 (11th Cir. 2012) ("Those who ask courts to give effect to
perceived legislative intent by interpreting statutory language
contrary to its plain and unambiguous meaning are in effect asking
courts to alter that language, and courts have no authority to
alter statutory language.") (citation omitted); Country Best v.
Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004) ("When
the import of the words Congress has used is clear . . . we need
not resort to legislative history, and we certainly should not do
so to undermine the plain meaning of the statutory language.")
(internal quotations omitted).

secondary meaning prior to the dates that Defendants began registering, trafficking, or using the domain names.[10]  See Investacorp, 931 F.2d at 1524 (noting that a mark "must have attained secondary meaning before the date that appellee used [a] similar term.") (internal citation omitted); American Cruise Lines, 2017 WL 3528606 at *13, 2017 U.S. Dist. LEXIS 130430 at *34 (noting that "distinctiveness . . . can be determined at the time of any . . . re-registration[], including Defendant's most recent extension of the domain name registration.").

"Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." Investacorp, 931 F.2d at 1525; see also Bavaro Palace, S.A. v. Vacation Tours, Inc., 203 Fed. Appx. 252, 255 (11th Cir. 2006); Vision Ctr. v. Opticks, Inc., 596 F.2d 111, 118 (5th Cir. 1979).  It is a question of fact, and the Plaintiff must sustain "a high degree of proof" to establish secondary meaning of a descriptive term.  Investacorp, 931 F.2d at 1525; Bavaro Palace, 203 Fed. Appx. at 255; Vision Ctr., 596 F.2d at 119; Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc., 934, F.2d 1551, 1560 (11th Cir. 1991).

---

[10] In the instant case, that means that the marks are only entitled to protection under the ACPA if they had acquired secondary meaning prior to May 11, 2016, the date on which Defendants began purchasing and utilizing the domain names; June-September 2016, the dates during which Defendants redirected the domain names to their own website; or March 14, 2017, May 11, 2018, or May 27, 2018, the dates on which Defendants re-registered the domain names.

A party may make a prima facie showing of acquired secondary meaning "by showing that the name has been used in connection with the proprietor's goods or service continuously and substantially exclusively for five years." Welding Servs., 509 F.3d at 1358; see also Jysk, 810 F.3d at 778-79. Absent such a showing, courts within the Eleventh Circuit generally examine the following factors to determine whether a mark has acquired secondary meaning:

> (1) [T]he length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service].

Investacorp, 931 F.2d at 1525 (internal citation omitted); see also Welding Servs., 509 F.3d at 1358; Bavaro Palace, 203 Fed. Appx. at 255.

In addition, "[r]egistration of a trademark on the principal register of the USPTO is prima facie evidence of validity and establishes a [rebuttable] presumption that the mark is protectable or distinct." Edge Sys. LLC v. Aguila, 186 F. Supp. 3d 1330, 1347 (S.D. Fla. 2016); see also 15 U.S.C. § 1057(b). However, "[w]hile registration creates a rebuttable presumption of the validity of the registration and the holder's right to its exclusive use, . . . that does not affect the ultimate burden of proof to be carried by the plaintiff in an . . . action." Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1182 n.4 (11th Cir. 1985);

see also Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311 (5th Cir. 1981).  Further, the presumption of acquired secondary meaning only applies "as of the date that [the mark] was registered."  Unique Sports Prods., Inc. v. Babolat VS, 403 F. Supp. 2d 1229, 1236-37 (N.D. Ga. 2005) (holding that the February 13, 2001 registration of a trademark did not operate against uses of that mark that began prior to the mark's registration); see also Gulf Coast Commercial Corp. v. Gordon River Hotel Assoc., 508 F. Supp. 2d 1157, 1164 (M.D. Fla. 2007) ("Although [plaintiff] is entitled to a presumption that its mark has acquired secondary meaning as of the date it was registered . . . the relevant date for determining secondary meaning is . . . the date [defendant] began using the [similar mark]."); Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 870 (8th Cir. 1994) (finding that plaintiff's marks acquired secondary meaning on the date that the USPTO registered the marks); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:34 (2018).

In the instant case, ZP argues that its marks were distinctive at the time Defendants registered the subject domain names, and that it is entitled to a rebuttable presumption of distinctiveness based on its registration of the marks.  The undisputed evidence shows that ZP applied for registration of the One Ten Student Living and One Ten marks in December 2016 and March 2017, respectively, and that the applications were accepted by, and

registration obtained from, the U.S. Patent and Trademark Office on July 25, 2017 and October 17, 2017. Accordingly, any rebuttable presumption based on registration of the marks could apply only to Defendants' alleged violations occurring *after* July 25, 2017, when the first mark was registered. Defendants' alleged violations occurring *before* July 25, 2017 (which would include Defendants' May 2016 registration of the domain names, Defendants' June through September 2016 redirection of the websites, and Defendants' March 14, 2017 re-registration of the domain names) would not be subject to a rebuttable presumption of distinctiveness based on registration of the marks. See Unique Sports, 403 F. Supp. 2d at 1237.

In order to proceed with its ACPA claims against Defendants (or prevail on its motion for summary judgment) based on violations occurring *before* July 25, 2017, ZP must show that the One Ten marks had acquired secondary meaning before each of the alleged violations. Applying the factors set forth above, the Court finds that ZP has failed to show that the One Ten marks had acquired secondary meaning *before* July 25, 2017.

First, as discussed, a party may make a prima facie showing of acquired secondary meaning/distinctiveness "by showing that the name has been used in connection with the proprietor's goods or service continuously and substantially exclusively for five years." Welding Servs., 509 F.3d at 1358. However, the undisputed

evidence in the instant case shows that the earliest date on which ZP may argue that the marks were "continuously and substantially exclusively" in use is October 2015, one year before this action was instituted and approximately six months before Defendants registered the May 11 domains, which is substantially less than the five-year mark required by the Eleventh Circuit to make a prima facie showing. <u>Welding Servs.</u>, 509 F.3d at 1358. Therefore, an examination of the four factors enumerated by the Eleventh Circuit is required.[11] <u>See</u> <u>Investacorp</u>, 931 F.2d at 1525.

Although ZP has failed to address the factors enumerated in <u>Investacorp</u>, the Court has done so in order to determine whether the marks acquired a secondary meaning. With regard to the length and manner of ZP's use of the marks, as noted, *supra*, the earliest date on which ZP arguably used the marks is October 2015, some six to seven months prior to Defendants' registration of the May 11 and May 27 domain names.

---

[11]   As noted supra, where there is no prima facie showing that marks were "continuously and substantially exclusively" in use for at least five years, the following factors are examined: (1) [T]he length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service].

<u>Investacorp</u>, 931 F.2d at 1525 (internal citation omitted).

In October 2015, ZP made preparations to use the marks by determining that its housing facility would be named One Ten Student Living, by signing a management agreement with ACH utilizing the name, and by updating the ZDC Company Profile to include the facility by name. (Doc. 106 at 2; Doc. 106-1 at 3, 24; Doc. 106-3 at 4; Doc. 106-4 at 2). Between December 2015 and February 2016, ZP sent ZDC's Company Profile, which included one mention of the newly-styled One Ten Student Living, to approximately twenty-seven (27) vendors, lenders, and realtors throughout the country. (Doc. 106 at 2; Doc. 106-3 at 4; Doc. 106-4 at 2, 19-22, 24-25, 27-45). ZP registered its domain name, "liveoneten.com," on December 3, 2015 (Doc. 106 at 2; Doc. 106-1 at 3; Doc. 106-4 at 68-69) and created a Twitter page for One Ten Student Living on May 19 2016, some eight days after Defendants' purchase of the May 11 domain names. (Docs. 106 at 3; 106-3 at 3-4; 106-4 at 43). These actions by ZP, all taken in the six to seven months preceding Defendants' registration of the domain names, weigh against a determination that the marks had acquired secondary meaning by May 11 or 27, 2016, or by June 14, 2016, the date on which Defendants began redirecting the May 11 domains. See Investacorp, 931 F.2d at 525 (finding that there was no significance in an appellant's use of their mark "other than appellant merely "display[ing] its service mark on nearly all of its transactional documents.").

An examination of the marks' use during the period leading to the March 14, 2017, re-registration of the domain names is similarly unavailing. At the time that the Defendants re-registered the domain names on March 2017, in addition to the aforementioned actions, ZP had applied for federal registration of the One Ten Student Living mark in the Principal Register of the USPTO, but that registration had not been approved and, in any event, would not support a finding of acquired secondary meaning, as it occurred after the initial 2016 registrations, 2016 redirection, and March 2017 re-registration of the domains. Therefore, the length and manner of the marks' use weigh against a finding that ZP's marks had acquired secondary meaning either at the time of Defendants' May 2016 domain registrations, June 2016 through September 2016 redirection, or the March 2017 re-registration. See, e.g., id. at 525-525 (finding that secondary meaning did not attach even though the plaintiff had used the mark for five years prior to defendant's use of the mark); Donut Joe's, Inc. v. Interveston Food Servs., LLC, 101 F. Supp. 3d 1172, 1182 (N.D. Ala. 2015) (noting that Eleventh Circuit case law leads to the inference that two years is insufficient for secondary meaning to attach). But see Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984) (holding that the first factor supported a finding of secondary meaning when the plaintiff prominently

displayed its mark on the majority of its products for over 25 years).

Regarding the nature and extent of ZP's advertising and promotion of the marks, in the six to seven months preceding Defendants' purchase/registration and use of the domain names, ZP spent approximately $5,229.83 advertising and promoting One Ten. (Doc. 85 at 63-67). In total, between December 2015 and December 2016, ZP spent $43,430.05 on advertising and promotions for One Ten, including $17,545.71 spent during the period in which the May 11 domains were redirected. (Id.). The record reflects that the domain name, "liveoneten.com," was registered on behalf of ZP on December 3, 2015, and that, by February 26, 2016, ZP had begun using the domain name to market One Ten Student Living on ZDC's then-existing website, such that internet users could see the advertisement for the housing facility. (Docs. 106 at 2; 106-1 at 3; 106-4 at 68-69; 106-6 at 2-3). This meager showing is not sufficient to establish that the marks had acquired secondary meaning by May 11, 2016.

Further, in determining whether secondary meaning had attached to the marks by March 2017, the Court notes that the website for One Ten went live on May 26, 2016 (Doc. 106 at 3; Doc. 106-3 at 3-4; Doc. 106-4 at 43); that ZP began its first open marketing efforts during the week of September 13, 2016 (Doc. 83 at 7; Doc. 95 at 59; Doc. 94-3 at 3; Doc. 115 at 6); and that ZP

advertised the grand opening for One Ten Student Living as occurring on November 10, 2016 (Doc. 87-9 at 2-3; Doc. 115 at 6-7). Again, the amount of money spent by ZP on marketing and promotion of the marks, coupled with the marketing activities undertaken by ZP, support a finding that secondary meaning had not attached at the time of the alleged May 2016 or March 2017 violations. Compare Investacorp, 931 F.2d at 1519 (finding that the second factor weighed against secondary meaning when appellant spent approximately one hundred dollars per month on advertising) with Conagra, 743 F.2d at 1513 (finding that the second factor of this analysis supported a finding of secondary meaning in favor of defendant when they spent over $400,000 per year on marketing and promotion).

Having found that the first two factors support a finding that secondary meaning had not attached to ZP's marks by either May 2016 or March 2017, the analysis becomes even less favorable to ZP when considering the final two factors. For instance, there is little evidence in terms of the intentional efforts ZP made to promote a connection in the public's mind between the marks and the One Ten Student Living housing facility. ZP made social media posts to its Facebook and Instagram accounts on May 25 and 26, 2016, days after Defendants purchased the first domains on May 11, 2016. Further, as noted, *supra*, in the months leading to the March 2017 re-registration of the domains, ZP engaged in certain

marketing efforts in September 2016 and November 2016. However, these actions, without more, are insufficient to support a finding that secondary meaning had attached to the marks prior to Defendants' alleged violations from May 2016 to March 2017.

Finally, "[w]hether the public actually identifies the name with plaintiff is the 'most telling factor' when determining whether a mark has acquired a secondary meaning." Ala. Credit Union v. Credit Union of Ala. Fed. Credit Union, 2008 WL 11422049 at *7 (N.D. Ala. Mar. 31, 2008) (citing Conagra, 743 F.2d at 1513); see also Gulf Coast, 508 F. Supp. 2d at 1165-66 ("The ultimate test of secondary meaning is whether the term . . . has become broadly known to the public" in association with the service being offered). Without quantifiable proof, actual identification is difficult to prove. See Investacorp, Inc. v. Arabian Inv. Banking Corp., 722 F. Supp. 719, 723-24 (S.D. Fla. 1989). Here, ZP has presented no survey evidence or any other quantifiable data that supports a finding that that the public actually identified ZP's marks with its housing facility, effectively precluding the Court from determining whether this factor weighs in favor of, or against, a finding of secondary meaning. See Gulf Coast, 508 F. Supp. 2d at 1166 (noting that the plaintiff failed to present quantifiable proof in support of this factor, which prevented the court from finding that the mark at issue had acquired secondary meaning).

Considering the totality of the undisputed evidence on this issue, the undersigned finds, as a matter of law, that ZP's marks had not acquired the requisite secondary meaning necessary to gain distinctiveness and sustain a claim under the ACPA *before* July 2017 (*i.e.*, at the time of Defendants' 2016 registration and redirection and March 2017 re-registration of the domain names). The evidence of the length and manner of the use of the marks weighs against a finding of secondary meaning, and there is little evidence to establish the remaining factors. Thus, ZP has not met its heavy burden of establishing that the marks had acquired secondary meaning by May 11, 2016, May 27, 2016, June 14 through September 20, 2016, or March 14, 2017.

Accordingly, ZP's motion for summary judgment as to its cybersquatting claim (Count IV) is **DENIED** as to the alleged violations occurring *before* July 2017. See Gulf Coast, 508 F. Supp. 2d at 1166 (denying plaintiff's motion for summary judgment when the mark at issue had been used for eight years; plaintiff spent over $7 million on advertisements and promotions; and plaintiff's actions were consciously taken to promote a connection between its service and its mark, but plaintiff failed to provide quantifiable data on whether the public actually identified its mark with its service).

Conversely, having found that the undisputed evidence establishes that ZP's marks lacked acquired secondary

meaning/distinctiveness as a matter of law before July 2017, Defendants' motions for summary judgment on ZP's cybersquatting claim (Count IV) based on violations occurring *before* July 2017 are **GRANTED**.

### 2. Distinctiveness of Marks *after* July and October 2017.

On May 11, 2018, Defendants filed a "Notice of Auto-Renewal" with the Court, wherein they advised that they would be re-registering the domain names at issue on May 11 and 27, 2018, in order to "maintain the status quo while this case is pending." (Doc. 112). ZP argues that the fact that Defendants filed a "notice" of its re-registration of the domain names with the Court does not diminish the viability of its ACPA claim. (Doc. 113). The Court agrees.

As noted *supra*, the re-registration of domain names is actionable under the ACPA. To affirmatively establish a claim of cybersquatting under the ACPA, ZP must establish that (1) Defendants registered, trafficked, or used (2) a domain name that was identical or confusingly similar to (3) a distinctive mark (4) with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A); Jysk, 810 F.3d at 775.

As stated, it is undisputed that Defendants re-registered the domain names in May 2018, several months *after* ZP's marks had been granted registration with the USPTO. (Doc. 112). While Defendants maintain that the 2018 re-registration was intended to maintain

the "status quo" during the pendency of this action, they have cited no case law that would support the proposition that the 2018 re-registration should not be considered actionable under the ACPA. Accordingly, having determined that the re-registration of a domain name constitutes an actionable "registration" under the ACPA, Defendants' May 11 and 27, 2018 re-registration of the domain names falls under the purview of the ACPA.

Also, as previously noted, in determining distinctiveness for purposes of the ACPA, a mark must have attained distinctiveness or secondary meaning by the date of a defendant's allegedly infringing action. Investacorp, 931 F.2d at 1524. Registration of trademarks with the USPTO acts as prima facie evidence of distinctiveness as of the date that the mark was registered. Unique Sports Prods., 403 F. Supp. 2d at 1236. While the registrations of ZP's marks with the USPTO in July and October 2017 do not act as prima facie evidence of distinctiveness of the marks *prior to* the date that they were registered, ZP may properly rely on the USPTO registration with regard to Defendants' alleged violations occurring *after* July and October 2017, namely, the May 2018 re-registration of the marks. It is undisputed that ZP's marks were granted registration with the USPTO on July 25, 2017 and October 17, 2017, thus creating a rebuttable presumption of distinctiveness that began on those dates. See Edge Sys., 186 F. Supp. 3d at 1347. There is nothing before the Court that would

support a rebuttal of the distinctiveness of ZP's marks as of the dates of the marks' registration with the USPTO, such that the Court finds, as a matter of law, that the marks were distinctive *after* July 2017, and, thus, were distinctive on May 11 and 27, 2018, the dates on which Defendants re-registered the domains.

Accordingly, the Court now will consider the remaining elements of ZP's ACPA claim with respect to the alleged ACPA violations occurring *after* July 2017, namely, the May 11 and 27, 2018, re-registrations.

### 3. Identicality or Confusing Similarity of the Domain Names with ZP's Marks.

Defendants' website is www.campusquarters.com. ZP's website is www.liveoneten.com. Defendants have registered eight other domain names that ZP contends are confusingly similar to its "One Ten" and "One Ten Student Living" marks. The domain names registered by Defendants are: liveontenmobile.com; onetenlive.com; liveone10.com; onetenliving.com, onetenstudentliving.com; liveonetenapartments.com; onetenusa.com; and liveonetenmobile. com.

"In the cybersquatting context, 'confusingly similar' means that the plaintiff's mark and the defendant's domain name are so similar in sight, sound[,] or meaning that confusion is likely." Heron Dev. Corp. v. Vacation Tours, Inc., 2018 WL 2943217 at *7 (S.D. Fla. Jun. 12, 2018) (internal quotations and citations

omitted). Further, "[a] reasonable interpretation of conduct covered by the phrase "confusingly similar" is the intentional registration of domain names that are misspellings of distinctive or famous names . . ." Shields v. Zuccarini, 254 F.3d 476, 484 (3d Cir. 2001).

Here, Defendants incorporate ZP's marks exactly or, at the very least, in a confusingly similar manner. For instance, the domain name liveonetenmobile.com is virtually identical to the website for One Ten Student Living, www.liveoneten.com. In addition, liveontenmobile.com incorporates a misspelling of the word "one" and substitutes "on" in its place. Also, onetenstudentliving.com completely incorporates the One Ten Student Living mark (for which ZP had attained registration by the time of Defendants' 2018 re-registration of the domain names). For one of the infringing domain names, Defendants merely substituted the word "Ten" for the number 10. All of these variations of the One Ten mark, in addition to the complete incorporation of the One Ten Student Living mark, constitute domain names that are confusingly similar to ZP's marks. See, e.g., Dell, Inc. v. BelgiumDomains, LLC, 2007 WL 6862342 at *7 (S.D. Fla. Nov. 21, 2007) (holding that, where defendants' domain names included the substitution of numbers for letters and intentional misspellings of plaintiff's marks, the domain names were confusingly similar). Further, the fact that both ZP and

Defendants own/operate off-campus accommodations for local university students makes customer confusion more likely. <u>See John H. Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 976 ("The greater the similarly between the products and services, the greater the likelihood of confusion.") (internal quotations omitted); <u>Heron Dev. Corp.</u>, 2018 WL 2943217 at *7. Accordingly, the Court finds, as a matter of law, that Defendants' domain names in the case at bar are confusingly similar to ZP's marks.

### 4. Bad Faith Intent to Profit.

"[A] bad faith intent to profit is the essence of the wrong that the [ACPA] seeks to combat." <u>Southern Grouts & Mortars, Inc. v. 3M Co.</u>, 575 F.3d 1235, 1246 (11th Cir. 2009). A plaintiff may not establish only that a defendant operated in bad faith; rather, "[a] defendant is liable only where a plaintiff can establish that the defendant had a bad faith *intent to profit*." <u>Id.</u> (emphasis in original) (internal quotation marks omitted); 15 U.S.C. § 1125(d).

In determining whether Defendants possessed the bad-faith intent to profit from ZP's marks, the ACPA identifies nine non-exhaustive factors for courts to examine: (1) the trademark or other intellectual property rights of Defendants, if any, in the domain names; (2) the extent to which the domain names consist of the legal name or commonly used names of Defendants; (3) Defendants' prior use of the domain names for the bona fide offering of goods or services; (4) any bona fide noncommercial or

fair use of the mark under the domain names; (5) Defendants' intent to divert consumers from Plaintiff's website to Defendants' website by creating a likelihood of confusion; (6) Defendants' offer to transfer, sell, or otherwise assign the domain names to Plaintiff or others for financial gain; (7) Defendants' provision of material and misleading false contact information when registering the domain names and their intentional failure to maintain accurate contact information; (8) Defendants' registration or acquisition of multiple domain names that they know are identical or confusingly similar to marks of others; and (9) the extent to which Plaintiff's marks are or are not distinctive and famous. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). However, the most important grounds for finding a bad faith intent to profit "are the unique circumstances of [a] case, which [may] not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the [ACPA]." Sporty's Farm, LLC v. Sportsman's Mkt., Inc., 202 F.3d 489, 499 (2d Cir. 2000); see also Southern Grouts, 576 F.3d at 1244.

First, regarding Defendants' trademark or intellectual property rights to the domain names, the Court has discovered no information that would suggest that these rights exist, nor has Defendant attempted to establish that they do. Second, the extent to which Defendants' domain names consist of its legal name or one that it commonly uses, it is uncontested that the phrases "One

Ten" and "One Ten Student Living" are not associated with Defendants' legal name or one which it commonly uses. Third, there is no evidence that Defendants have previously used the domain names for the bona fide offering of goods or services. Fourth, there is no evidence that Defendants made any noncommercial or fair use of the marks. Fifth, Defendants did intend to divert internet users from ZP's site to its own by redirecting the May 11 domains, which are confusingly similar to ZP's marks, to the Campus Quarters website. (See Doc. 106-5 at 54-58). Sixth, there is no evidence that Defendants offered to transfer, sell, or otherwise assign the domain names to Plaintiff or others for financial gain. ZP relies on Defendants' internal response of, "Tel him FU!" when ZP made its pre-suit demand to transfer the domain name prior to litigation. However, this evidence suggests hostility and bad faith, but does not reasonably suggest an intent to profit. Further, to the extent that ZP relies on communications made during settlement negotiations in support of this factor (see doc. 106 at 19), the Federal Rules of Evidence clearly preclude the consideration of such communications for the purpose of providing the validity or invalidity of a claim. See Fed. R. Evid. 408(a). Seventh, there has been no affirmative evidence establishing that Defendants used material and misleading false contact information when registering the domain names. While ZP points to Defendants' registration of the domain names using a privacy service as

evidence of using false and misleading contact information (see doc. 106 at 19, 21, 28), "[u]se of a privacy protection service is not the same thing as providing false or misleading contact information." Career Agents Network, Inc. v. careeragentsnetwork. biz, 2010 WL 743053 at *5 (E.D. Mich. Feb. 26, 2010). Eighth, in May 2018, Defendants re-registered eight domain names that they knew were confusingly similar to ZP's marks. Finally, as noted *supra*, ZP's marks were distinctive on the dates of the 2018 re-registrations.

In addition to the factors enumerated above, the undersigned looks to the unique circumstances of this case. The consideration of whether there has been a violation of the ACPA is limited to the very attenuated issue of whether a violation occurred when Defendants re-registered the domain names on May 11 and 27, 2018. The Southern Grouts court spoke directly to this issue. There, the Eleventh Circuit found that a plaintiff failed to establish a bad faith intent to profit when one of the instances on which the plaintiff relied included the fact that the defendant maintained control of the domain name at issue, including re-registering it after a cease-and-desist letter issued and again after the action was instituted. Southern Grouts, 575 F.3d at 1245-46. The court, in rejecting this issue as evidence of bad faith *intent to profit*, stated, "[t]his circumstance does not, however, tip our analysis toward a conclusion that [defendant] has violated the

Anticybersquatting Consumer Protection Act." Id. at 1246. As

noted by the Eleventh Circuit:

> The Senate Report accompanying the Anticybersquatting
> Consumer Protection Act . . . defines cybersquatters as
> those who:
>
> > (1) "register well-known brand names as
> > Internet domain names in order *to extract
> > payment from the rightful owners of the
> > marks*;" (2) "register well-known marks as
> > domain names and warehouse those marks *with
> > the hope of selling them* to the highest
> > bidder;" (3) "register well-known marks *to
> > prey on* consumer confusion by misusing the
> > domain name to divert customers from the mark
> > owner's site to the cybersquatter's own site;"
> > (4) "target distinctive marks *to defraud
> > consumers*, including to engage in
> > counterfeiting activities."
>
> Lucas Nursery & Landscaping v. Grosse, 359 F.3d 806, 810
> (6th Cir. 2004) (quoting S. Rep. No. 106-140 (1999),
> 1999 WL 594571 at *5-6 (emphasis added)). The report
> says nothing about those who hold on to a domain name to
> prevent a competitor from using it.
>
> Congress enacted the Anticybersquatting [Consumer]
> Protection Act in response to concerns over the
> "proliferation of cybersquatting – the Internet version
> of a land grab." [internal quotations omitted]. . . .
> Southern Grouts accuses 3M not of a design to sell a
> domain name for profit but of a refusal to sell one.

Southern Grouts, 575 F.3d at 1246-47. The court also noted that

a defendant could have an intent to profit when they divert

customers from the trademark owner's website to the defendant's

website, such that consumers would purchase defendant's services

instead of the trademark owner's services. Id. at 1247.

Here, while ZP has shown that Defendants clearly acted in bad faith, the question is whether Defendants intended to profit from their 2018 re-registration of the domain names. On this issue, ZP's evidence includes Defendants' response to one of its many demands that Defendants transfer the domain names to ZP, including the "onetenstudentliving.com" domain, to which Defendants responded: "[i]n brief, that domain name is reserved for *potential future use in business operations*." (Doc. 106-13 at 21) (emphasis added). While the Court agrees with Defendants that its action in holding onto the domain names to prevent ZP from using them may not, alone, evince an intent to profit, <u>see</u> <u>Southern Grouts</u>, when taken together with the other circumstances of this case, including the fact that the marks were registered with the USPTO by July/October 2017; that Defendants had a history of redirecting the domains to its own website (prior to the marks' registration) for the admitted purpose of "*achiev[ing] more traffic for the Campus Quarters website*" (<u>see</u> Doc. 95 at 31); and the fact that Defendants intended to hold onto the domain names for *potential future use in their business operations,* such could reasonably suggest a bad faith intent to profit from the 2018 re-registration of the domain. Defendants' contradictory assertion that their only motive in re-registering the domain names in 2018 was to maintain the status quo during the pendency of this litigation simply places this issue in dispute.

In sum, at this juncture, the undersigned cannot find, as a matter of law, that Defendants did not act with a bad faith intent to profit with regard to the May 2018 re-registration of the domain names. Thus, there remains a genuine issue of material fact as to the element of bad faith intent to profit that prevents the issuance of summary judgment on this issue. Accordingly, for the foregoing reasons, the Court **DENIES** both ZP's and Defendants' motions for summary judgment on ZP's cybersquatting claim (Count IV) as to any alleged violations occurring *after* July 2017 (specifically including, Defendants' May 11 and 27, 2018, re-registration of the domain names).

## B. <u>Unfair Competition Claims Under the Lanham Act and Based on Federal Common Law (Counts I, V)</u>.

In the second amended complaint, Plaintiff also asserts claims for unfair competition under the Lanham Act (Count I) and unfair competition based on federal common law (Count V). (Doc. 60). The Lanham Act, 15 U.S.C. § 1125(a), was intended to make "actionable the deceptive and misleading use of marks[,]" and "to protect persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127. The Act provides a cause of action for unfair competition by stating:

> (1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

> (A) is likely to cause confusion, or to cause
> mistake, or to deceive as to the affiliation,
> connection, or association of such person with
> another person, or as to the origin,
> sponsorship, or approval of his or goods,
> services, or commercial activities by another
> person
>
> . . .
>
> shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged by
> such act.

15 U.S.C. § 1125(a)(1)(A). Actions brought under this section are commonly referred to as § 43(a) actions.

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition by prohibiting the use in interstate commerce of any 'word, term, name, symbol or device, ... or any false designation of origin ... which is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.'" Tana, 611 F.3d at 772 (quoting 15 U.S.C. § 1125(a). "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show '(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'"[12] Id. (quoting Lone

---

[12] Marks (or trademarks) are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods ... from those manufactured or sold by others and to

Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997)); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001); Conagra, 743 F.2d at 1512.

"To satisfy the first element of § 43(a) — proof of a valid trademark — a plaintiff need not have a registered mark." Tana, 611 F.3d at 773. "[T]he use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." Id. (quoting Conagra, 743 F.2d 1508, 1512-13 (11th Cir. 1984) (internal quotations and citations omitted). "However, only those marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." Id. As previously discussed, "though not inherently distinctive, [a mark] may become sufficiently distinctive to enjoy trademark protection by acquiring 'secondary meaning.'" Tana, 611 F.3d at 774. A mark is entitled to a presumption of acquired secondary meaning and, thus, protectability, as of the date of the

indicate the source of the goods." Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010) (quoting 15 U.S.C. § 1127).

marks' registration with the USPTO.  See Unique Sports, 403 F. Supp. 2d at 1236; Gulf Coast Commercial, 508 F. Supp. 2d at 1164; Aromatique, 28 F.3d at 870.

Under both the Lanham Act and federal common law, "trademark rights are appropriated only through actual prior use in commerce." Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022 (11th Cir. 1989).  "For Lanham Act purposes, under § 1125(a), a defendant may be liable if he has used the plaintiff's mark 'in commerce' in a way that either 'is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .'" Planned Parenthood Fed'n of Am., Inc. v. Bucci, 1997 U.S. Dist. LEXIS 3338, *1, 1997 WL 133313, *3 (S.D.N.Y. Mar. 24, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998)(quoting § 1125(a)(1)(A)).

In Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1194-95 (11th Cir. 2001), the Eleventh Circuit held that the distribution of software for end-users over the Internet satisfied the "use in commerce" jurisdictional predicate.  Id. (citing Planned Parenthood, 1997 WL 133313 (S.D.N.Y.1997) ("The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement.").  The court in Planetary Motion

42

further noted that, "[b]ecause Congress's authority under the Commerce Clause extends to activity that 'substantially affects' interstate commerce . . ., the Lanham Act's definition of 'commerce' is concomitantly broad in scope: 'all commerce which may lawfully be regulated by Congress.'" Id. (quoting 15 U.S.C. § 1127).

In sum, to establish its § 43(a) and federal common law unfair competition claims, ZP must establish that it had prior rights to the marks at issue; that Defendants adopted a mark or name that was the same, or confusingly similar to, ZP's marks, such that consumers were likely to confuse the two; and that Defendants used the marks in commerce. 15 U.S.C. § 1125(a)(1); Planetary Motion, 261 F.3d at 1188 ("In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition. . . . Common law and statutory trademark infringements are merely specific aspects of unfair competition."). Thus, the legal standard for both common law and statutory unfair competition is essentially the same, such that resolution of the former will resolve the latter.

First, having previously found, as a matter of law, that Defendants' domain names at issue are confusingly similar to ZP's marks, that question is settled. Second, with respect to ZP's prior rights to the marks, the undersigned has previously found, as a matter of law, that the marks did not acquire secondary

meaning *before* July 2017. Accordingly, ZP had no protectible interest in the marks under the Lanham Act or federal common law *before* July 2017. As a result, ZP's motion for summary judgment on its Lanham Act and federal common law unfair competition claims (Counts I and V) is **DENIED** as to any alleged violations by Defendants occurring *before* July 2017. For the same reason, Defendants' motions for summary judgment on ZP's Lanham Act and federal common law unfair competition claims (Counts I and V) are **GRANTED** as to any alleged violations by Defendants occurring *before* July 2017.

On the other hand, the Court has also found, as a matter of law, that ZP's marks acquired secondary meaning *after* they were registered with the USPTO in July and October 2017 and that ZP had a protectible interest in the marks at the time of Defendants' May 2018 re-registration of the domain names. The question remains, however, whether Defendants' re-registration of the domain names in May 2018 constituted use of ZP's marks "in commerce." On that question, the Court finds that reasonable minds could differ.

As previously discussed, the evidence shows that, in May 2016, Defendants registered eight domain names on the Internet that the Court has found herein, as a matter of law, are identical or confusingly similar to the marks at issue in this case. Thereafter, from June to September 2016, Defendants redirected Internet users of five of those domain name websites to their own

website for the express purpose of "*achiev[ing] more traffic for the Campus Quarters website.*"[13]  (Doc. 95 at 31).  Then, on October 7, 2016, Defendants refused to transfer the "onetenstudentliving. com" domain to ZP, stating that they were keeping it "for *potential future use in business operations*."  (Doc. 106-13 at 21) (emphasis added).   Later, with full knowledge that ZP, their competitor, had obtained registration of the "One Ten Student Living" and "One Ten" marks in July and October 2017 with the USPTO, Defendants continued to re-register the domain names on the Internet in May 2018.  This evidence arguably suggests that Defendants were using the confusingly similar domain names "in commerce" in May 2018 when they re-registered the domain name websites on the Internet. To the extent that Defendants assert that they merely "parked" the websites on the Internet after they ceased redirecting users to their website in September 2016, the undersigned finds that their actions in parking the names, and thereby preventing ZP's commercial use of the names, could arguably constitute use "in commerce," thus creating a genuine issue of material fact on this issue.

---

[13] Defendants concede that the marks were used in commerce for purposes of federal common law and Lanham Act unfair competition claims from June 14, 2016 through September 20, 2016, the period in which users of the domain names were redirected to the Campus Quarters website. (Doc. 115 at 27-28).

The Court also notes that Defendants rely on <u>Juno Online</u> <u>Servs. v. Juno Lighting, Inc.</u>, 979 F. Supp. 684 (N.D. Ill. 1997), to support their position that "registering or holding onto [sic] a domain name, without more, is not use in commerce." (Doc. 115 at 27). However, as noted by a sister court, "a closer reading of <u>Juno</u> reveals that the court there addressed a situation where the 'only factual allegation in the complaint relating to 'use' was that the defendant *might* have been 'warehousing the domain name, and where the plaintiff conceded that the defendant had never used the domain name in connection with its business.'" <u>Southern Grouts</u> <u>& Mortars, Inc. v. 3M Co.</u>, 2008 WL 11333151 at *3 (S.D. Fla. Apr. 29, 2008); <u>Juno</u>, 979 F. Supp. at 691. That is a far cry from the facts of this case which include undisputed use of the domain name websites, namely, Defendants' redirection for several months in 2016 of five of the domain name websites to its own website, and an expressed intent to hold onto the websites for additional potential future use in commerce. Thus, <u>Juno</u> is distinct from the instant matter.

Having undertaken a thorough analysis of whether the May 2018 re-registration of the domains constitutes use in commerce for purposes of federal common law and the Lanham Act, the undersigned finds that there is sufficient disagreement that cannot be resolved at the summary judgment phase. That is, there remains a genuine issue of material fact as to whether the 2018 re-registration of

the domains constitutes a use "in commerce" under the Lanham Act and federal common law. Accordingly, both ZP's and Defendants' cross-motions for summary judgment on Plaintiff's Lanham Act and federal common law claims (Counts I and V) alleging violations by Defendants *after* July 2017 are **DENIED**.

### C. State Law Claims (Count VI).

In the second amended complaint, ZP asserts that Defendants are liable for trademark infringement and unfair competition under Alabama Code § 8-12-1, *et seq.,* and Alabama common law. (Doc. 60 at 12-14; Doc. 106 at 26). In support of its motion for summary judgment on these state law claims, ZP argues that its "proof of trademark infringement and unfair competition by Defendants under the Lanham Act also suffices to prove its claims under the statutory and common law of Alabama." (Doc. 106 at 26). In opposition to ZP's motion and in support of their own counter-motions for summary judgment, Defendants argue that ZP's state law claims fail because ZP had no protectible rights in the marks. Also, according to Defendants, there was no likelihood of confusion between the domain names and the marks, and Defendants did not "use" the marks (as that term is contemplated in the Alabama Trademark Act) *after* September 20, 2016, when Defendants ceased redirecting users of the domain names to its own website. (Doc. 115 at 29).

### 1. State Trademark Claims.

Under the Alabama Trademark Act, Ala. Code § 8-12-1, *et seq.*, any person who uses a registered mark "in connection with a business, or with the sale, offering for sale, or advertising of any goods or services" in a manner that is "likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services or the sponsorship of such business" is liable to the owner of the registered mark for trademark infringement. Ala. Code § 8-12-16.

Also, Alabama courts have long recognized a common law cause of action for trademark infringement (to prevent the infringement of trade names) under Alabama common law. <u>Alfa Corp. v. Alfa Mortg. Inc.</u>, 560 F. Supp. 2d 1166, 1175 (M.D. Ala. 2008) (citing <u>Fuqua v. Roberts</u>, 269 Ala. 59, 110 So. 2d 886, 887 (1959)). To set forth this claim, a plaintiff must demonstrate that its "trade is in danger of harm from the use of its name by the '[defendant] in such a manner as it is likely to deceive the public into the belief that the [defendant's] affairs, in the respect complained of, are those of the [plaintiff]." <u>Id.</u> "In other words, a central element of a claim of trademark infringement under Alabama common law, just as under the Lanham Act, is the likelihood consumers will be misled by the similarity of the parties' marks." <u>Alfa</u>, 560 F. Supp. 2d at 1175.

"[T]he test for the state-law infringement claim under Alabama common law is same as it is under the Lanham Act." Id. (citing Arthur Young, Inc. v. Arthur Young & Co., 579 F. Supp. 384, 389 (N.D. Ala. 1983). Indeed, "this Court's analysis of [plaintiff's] Alabama . . . common law trademark infringement counterclaim[] is the same as the analysis for the claims under federal law." Spire, Inc. v. Cellular South, Inc., 2017 WL 3995759, *6 (S.D. Ala. Sept. 11, 2017).

As previously determined, the domain names at issue in this case are confusingly similar to ZP's marks. Therefore, that issue is settled.

With respect to whether ZP had a protectible interest in its marks under Alabama state law, the Court notes that the Alabama Trademark Act, § 8-12-1, *et seq.*, extends coverage only to use of registered marks. See Teal v. Gibbs, 2011 WL 13229629, *6 (N.D. Ala. June 28, 2011) ("The Alabama Trademark Act creates a cause of action for the infringement of a registered mark. . . . Because Teal's name is not registered as a mark in the State of Alabama, the Court finds that Gibbs is entitled to summary judgment on Teal's claim for infringement under the Alabama Trademark Act."). Therefore, any use of the marks by Defendants before they were registered with the Alabama Secretary of State in March 2017 is not covered by the Act. Moreover, for the same reasons discussed with respect to ZP's cybersquatting and Lanham Act claims, the

Court finds that ZP did not have a protectible interest in the marks under Alabama common law prior to their registration with the Alabama Secretary of State in March 2017.[14] Therefore, ZP's state law trademark infringement claims (both statutory and common law) arising out of Defendants' use of the marks *prior to* March 2017 fail as a matter of law. However, as with the Lanham Act claims, the Court finds that ZP did have a protectible interest in the marks *after* March 2017, when the marks were registered with the Secretary of State.

The Court further finds, for the same reasons set forth in the Court's previous discussion of the Lanham Act claims, that a genuine issue of material fact exists as to whether Defendants' re-registration of the marks in May 2018 (when ZP had a protectible interest in the marks) constitutes "use" of the marks under the Alabama Trademark Act and state common law.[15] See, e.g., Ala. Code

---

[14] As stated, "the test for the state-law infringement claim under Alabama common law is same as it is under the Lanham Act." Alfa Corp., 560 F. Supp. 2d at 1175. Therefore, the Court will not repeat the lengthy discussion of how and when ZP's marks acquired secondary meaning. Let it suffice to say that, for the same reasons discussed in relation to the Lanham Act claim, ZP did not have a protectible interest under state law (nor did the marks acquire secondary meaning under state law) prior to their registration with the Alabama Secretary of State in March 2017.

[15] Defendants argue, as they did in response to ZP's Lanham Act claims, that the domain names "sat inert and parked, with no content being displayed thereon" in 2018 and, thus, were not being "used" at that time by Defendants in violation of the Alabama Trademark Act or state common law. (Doc. 115 at 29). As previously

§ 8-12-6 ("[a] mark shall be deemed to be used . . . [i]n connection with services when it is used or displayed in the sale or advertising of services and the services are rendered in this state; and . . . [i]n connection with a business when it identifies the business to persons in this state."); Alfa, 560 F. Supp. 2d at 1175 (to set forth a common law trademark infringement claim in Alabama, plaintiff must show that defendant "use[d] its name" (or mark) "in such a manner as it is likely to deceive the public into the belief that the [defendant's] affairs . . . are those of the [plaintiff].").

## 2. **State Law Unfair Competition Claim.**

Turning next to ZP's state law unfair competition claim, the Court observes that "Alabama law does not recognize a common-law tort of unfair competition." Alfa Corp., 560 F. Supp. 2d at 1175. However, a plaintiff may proceed with its claim if it has alleged "facts sufficient to establish a cause of action under the Alabama tort of interference with business relations." Id.; see also Midlothian Lab., LLC v. Pamlab, LLC, 509 F. Supp. 2d 1065, 1083, *vacated in part on other grounds*, 509 F. Supp. 2d 1095 (M.D. Ala. 2007). To present an actionable tort of intentional interference with business relations, a plaintiff must show: "(1) the existence of a protectible business relationship; (2) of which the defendant

discussed, Defendant's evidence related to this argument merely places the issue in dispute.

knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." <u>White Sands Group, LLC v. PRS II, LLC</u>, 32 So. 3d 5, 14 (Ala. 2009).

In this case, neither side has discussed the factors set forth above, let alone developed any arguments addressing whether the required showing has or has not been made. <u>Doe v. City of Demopolis</u>, 799 F. Supp. 2d 1300, 1310 n.21 (S.D. Ala. 2011). ("Courts are not saddled with the obligation to develop summary judgment arguments for litigants who fail to do so themselves."). In the absence of any arguments addressing the required showing, the Court finds that summary judgment is due to be denied on this claim.

Accordingly, based on the foregoing, ZP's motion for summary judgment on its state statutory and common law trademark infringement claims (Count VI) based on Defendants' use of the marks *before* March 2017 is **DENIED,** and Defendants' motions for summary judgment on said claims are **GRANTED.** In addition, both ZP's and Defendants' motions for summary judgment on ZP's state law trademark infringement and unfair competition claims (Count VI) based on Defendants' use of the marks *after* March 2017 are **DENIED.** Also, ZP's and Defendants' motions for summary judgment based on ZP's interference with business relations claim (Count VI) is **DENIED.**

### D. **Contributory and Vicarious Liability (Counts II, III)**.

In the second amended complaint, ZP asserts that each of the Defendants is vicariously and contributorily liable for use and promotion of the domain names, unfair competition, and trademark infringement under the Lanham Act, federal common law, state common law, and Alabama Code, § 8-12-1 *et. seq.* (Doc. 60). In support of its motion for summary judgment on these claims, ZP argues that the undisputed evidence shows that Defendants acted as a "team" to infringe on ZP's proprietary rights and to engage in unfair competition against ZP and that each Defendant is liable under contributory and vicarious theories of liability for intentionally inducing each other to infringe on ZP's trademark rights. (Doc. 106 at 27-30).

Specifically, ZP argues that Defendants ILM Capital, LLC (a real estate investment firm that owns Campus Quarters), Michael Wheeler (the manager, CEO, and sole member of ILM Capital, ILM Management, and WE Communities), and A.J. Hawrylak (an employee of ILM Capital who was involved in the domain activity and communications), each had direct control over the registration, maintenance, and use of the domain names; that they were identified by name in the GoDaddy records as having access and control rights to the various domain name accounts; and that the activity records show that Wheeler and Hawrylak specifically participated in

management of the domains, including their initial registration, the masking through the privacy service, the instructions to redirect the domain names to the Campus Quarters domain and its website, and in the renewal of the domains during the pendency of this lawsuit. (Doc. 106 at 28-29). In addition, ZP argues that Defendants ILM Mobile Management LLC, We Communities LLC, Mobile CQ Student Housing LLC, and Mary Schaffer-Rutherford operated the Campus Quarters facility and actively participated in the use of the infringing domain names. (Id. at 29).

In opposition to ZP's motion and in support of their own counter-motions for summary judgment, Defendants argue that, "[b]ecause none of the Defendants bear primary liability for unfair competition or trademark infringement, no Defendant can be secondarily liable for such conduct." (Doc. 115 at 29). In addition, Defendants dispute the degree of involvement of each of the Defendants in the decisions to register the domain names initially, to redirect the domain websites, and then to continue re-registering domain names. (Id.). The Court has previously found that there are genuine issues of material fact as to whether Defendants' re-registration of the domain names in 2018 violated ZP's rights in the One Ten and One Ten Student Living marks. The Court further finds that, with the exception of Defendant Mary

Schaffer-Rutherford, the evidence regarding each Defendant's level of direct participation is in dispute.[16]

Having found as a matter of law that ZP had no protectible interest in the marks under federal or state law until the registration of the marks with the Alabama Secretary of State on March 23, 2017, and with the USPTO in July and October 2017, all claims of vicarious and contributory liability based on conduct occurring *before* those dates "must fail as a matter of course." Midlothian Lab., 509 F. Supp. 2d at 1083. Therefore, ZP's motion for summary judgment as to its claims of vicarious and contributory liability based on Defendants' conduct occurring *before* March 23, 2017 (which would include the 2016 initial registration of the domain names, the 2016 redirection of the domain names, and the March 14, 2017, re-registration of the domain names) is **DENIED**, and Defendants' motions for summary judgment on said claims are **GRANTED**.

However, because there are genuine issues of material fact as to (1) whether Defendants' re-registration of the domain names in 2018 violated ZP's rights in the One Ten and One Ten Student Living marks under federal or state law, and (2) the level of involvement of each Defendant, aside from Defendant Mary Schaffer-Rutherford, in that conduct, both ZP's and Defendants' motions for summary

---

[16] The evidence, or lack thereof, with respect to Defendant Mary Schaffer-Rutherford will be addressed in the following section.

judgment on ZP's claims for contributory and vicarious liability occurring *after* March 23, 2017 are **DENIED**, except that Defendant's motion is **GRANTED** as to Defendant Mary Schaffer-Rutherford.[17]

**E. Defendant Rutherford's Motion for Summary Judgment**.

In their motions for summary judgment, Defendants universally dispute ZP's claims that any conduct in registering, redirecting, and re-registering the domain names at issue violated state or federal trademark or unfair competition law. In addition, Defendants divide themselves into groups based on the level of participation they are alleged to have had in the misconduct alleged in the second amended complaint.

First, Defendants ILM Capital, Michael Wheeler, and Andrew Hawrylak refer to themselves as the "ILM Defendants."[18] (Doc. 95 at 3). These Defendants do not deny direct involvement in the registration, redirection, and re-registration of the domain names at issue (see id.), although the exact nature and extent of their involvement in the alleged conduct is not clear. In any event,

_____

[17] As discussed, *infra*, Defendant Mary Schaffer-Rutherford is entitled to summary judgment on all of the claims asserted against her in this action.

[18] As stated, ILM Capital is a real estate investment company whose portfolio includes Campus Quarters in Mobile, Alabama; Wheeler is the manager and sole member of ILM Capital; and Hawrylak is an employee of ILM Capital. (Doc. 95 at 4). All of the domain names at issue in this case were registered through Wheeler's account with GoDaddy.com. (Id. at 5 n.4).

these Defendants are not entitled to summary judgment on the basis of non-involvement.[19]

Defendants ILM Management, WE Communities, and Mobile CQ filed a separate motion for summary judgment, essentially arguing that any actions taken with regard to the domain names at issue were taken by the ILM Defendants (ILM Capital, Wheeler, and Hawrylak) and that there is no evidence that Defendants ILM Management, WE Communities, and Mobile CQ had any relevant participation in this case.[20] (Doc. 96 at 3, 11). Defendants concede, however, that Defendant Wheeler is the manager and sole member of ILM Management, WE Communities, and Mobile CQ and had the power to control the affairs of those entities. (Id. at 5). In addition, ZP points out that the Campus Quarters property is owned by Mobile CQ, which is managed by ILM Management, which is

---

[19] According to ZP, these Defendants had administrative authority over the domain names; they were specifically identified by name in the GoDaddy records as having access and control rights to the various domain name accounts; and the activity records show that Wheeler and Hawrylak specifically participated in management of the domains, including their initial registration, the instructions to redirect the domain names to the Campus Quarters domain and its website; and in the renewal of the domain names during the pendency of this lawsuit. (Doc. 121 at 32).

[20] As previously stated, ILM Management is a non-member manager of Mobile CQ; Mobile CQ owns the real property on which Campus Quarters is situated; and WE Communities is a property management company that manages Campus Quarters. (Doc. 96 at 2). Defendant Wheeler is the manager and sole member of ILM Management, WE Communities, and ILM Capital. (Id.).

in turn managed and owned by Wheeler, whose GoDaddy account Hawrylak used to register the infringing domain names. (Doc. 121 at 32). Given the interrelated nature of the corporate entities involved and Defendant Wheeler's ownership/control over these entities, their specific role in the alleged infringing conduct murky at best. Therefore, summary judgment for Defendants ILM Management, WE Communities, and Mobile CQ is unwarranted at this stage of the proceedings.

With respect to Defendant Rutherford, she too has filed a separate motion for summary judgment and argues that she was not involved in any conduct that would impose liability in this case. (Doc. 97 at 1). The Court finds that the undisputed evidence relating to Defendant Rutherford's involvement is insufficient to create a genuine issue of material fact. The undisputed evidence shows that Defendant Rutherford was employed by WE Communities, as the general manager of Campus Quarters, between May and November 2016. (Doc. 97 at 2). The GoDaddy Account at issue was not in her name; she had no access to or control over the account; and her name does not appear anywhere in the documents produced by third parties relating to the GoDaddy Account. (Id.). In addition, she was not involved in the redirection of the domain names, and she no longer has any relationship, affiliation, or association with Campus Quarters (or any of the Defendants in this action). (Id.). Indeed, there appears to be no evidence of direct

involvement by Rutherford in the registration, redirection, or re-registration of the domain names at issue.

ZP responds that Rutherford worked for WE Communities, which managed the Campus Quarters facility and is managed by Wheeler, and that "she was feeding Hawrylak information about the One Ten and its electronic marketing efforts during the time he was registering the infringing Domain Names." (Doc. 121 at 33). ZP also points out that, on May 26, 2018, Rutherford sent an email to Hawrylak to notify him of One Ten's Instagram account and that One Ten's website had an image reflecting the appearance of the development. (Id.). Assuming these facts to be true, they do not evidence personal involvement by Rutherford in the registering, redirection, or re-registration of the domain names at issue. At best, they reflect that Rutherford was merely keeping an eye on her employer's competition. Based on the foregoing, the Court finds that Defendant Rutherford is entitled summary judgment on all claims alleged against her in the second amended complaint. Accordingly, Defendant Rutherford's motion for summary judgment is hereby **GRANTED.**

## VI. CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. 106) is **DENIED;** and Defendants' motions for summary judgment (Doc. 82, 94), are **GRANTED, in part, and DENIED, in part,** as follows:

Defendants' motions for summary judgment on ZP's cybersquatting claim (Count IV) as to alleged violations occurring *before* July 2017 are **GRANTED,** and Defendants' motions for summary judgment on ZP's cybersquatting claim (Count IV) as to alleged violations occurring *after* July 2017 are **DENIED;** Defendants' motions for summary judgment on ZP's Lanham Act and federal common law unfair competition claims (Counts I and V) as to alleged violations occurring *before* July 2017 are **GRANTED,** and Defendants' motions for summary judgment on ZP's Lanham Act and federal common law unfair competition claims (Counts I and V) as to alleged violations occurring *after* July 2017 are **DENIED;** Defendants' motions for summary judgment on ZP's state-law statutory and common law trademark infringement claims (Count VI) as to alleged violations occurring *before* March 2017 are **GRANTED,** and Defendants' motions for summary judgment on ZP's state-law statutory and common law trademark infringement claims (Count VI) as to alleged violations occurring *after* March 2017 are **DENIED;** Defendants' motions for summary judgment based on ZP's interference with business relations claim (Count VI) are **DENIED;** Defendants' motions for summary judgment on ZP's claims of contributory and vicarious liability (Counts II and III) as to alleged violations occurring *before* March 23, 2017, are **GRANTED,** and Defendants' motions for summary judgment on ZP's claims of contributory and vicarious liability (Counts II and III) as to

alleged violations occurring *after* March 23, 2017, are **DENIED;** and Defendant Rutherford's motion for summary judgment on all claims asserted against her in this action is **GRANTED.**

**DONE** this **27th** day of **September, 2018.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**